## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| HOWARD NATHANSON and GUS GORDON, derivatively on behalf of TORTOISE ENERGY INFRASTRUCTURE CORP. and TORTOISE MIDSTREAM ENERGY FUND, INC., | Case No. 22-cv-2328 <br><br> <u>Jury Trial Demanded</u> |
| Plaintiffs, | |
| v. | |
| TORTOISE CAPITAL ADVISORS, L.L.C., CONRAD S. CICCOTELLO, RAND C. BERNEY, H. KEVIN BIRZER, JENNIFER PAQUETTE, and ALEXANDRA HERGER, | |
| Defendants, | |
| -and- | |
| TORTOISE ENERGY INFRASTRUCTURE CORP. and TORTOISE MIDSTREAM ENERGY FUND, INC., | |
| Nominal Defendants. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR <u>DECLARATORY, INJUNCTIVE AND MONETARY RELIEF</u>

Plaintiffs Howard Nathanson and Gus Gordon ("Plaintiffs"), derivatively on behalf of the Tortoise Energy Infrastructure Corp. ("TYG") and the Tortoise Midstream Energy Fund, Inc. ("NTG") (together, the "Funds"), allege the following upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, based upon an investigation conducted by counsel, which included, among other things, review of materials obtained through public filings with the United States Securities and Exchange Commission ("SEC") and other publicly available sources, including press releases.[1]

## I.     INTRODUCTION

1.      This action arises from the *billion*-dollar collapse of two closed-end investment funds and the subsequent cover-up by the Funds' managers.

2.      The Funds are closed-end funds that invest in the energy industry. They are managed by their Board of Directors (the "Board") and investment adviser, Tortoise Capital Advisors, L.L.C. ("Tortoise"). Both the Board and Tortoise owe unexculpated fiduciary duties to manage the Funds with due care and loyalty to the interests of stockholders.

3.      Throughout the relevant period, Tortoise—under the Board's supervision—caused the Funds to take on reckless and unmanageable levels of financial leverage, which increased the Funds' assets and Tortoise's fees, but exposed the Funds to enormous risks and ultimately enormous losses.

4.      Defendants repeatedly informed investors that the Funds' policy was to maintain leverage within a range of 20% to 30% of total assets, but after permitting the Funds to marginally

---

[1] Plaintiffs also made an inspection demand on the Funds, which Defendants wrongfully rejected in disregard of Plaintiffs' inspection rights under Maryland law.

exceed 30% leverage for years, Tortoise allowed the Funds to significantly exceed the normal range in 2019.

5.      By the end of the Funds' 2019 fiscal year, the Funds' leverage levels were at or approaching 40%, making them nearly the most levered funds in their peer group.

6.      The increased leverage enabled Tortoise to reap over $80 million in additional management fees during the relevant time period, but greatly increased the risks to the Funds' stockholders. Indeed, Tortoise took the same unjustified risks in another fund that it was hired to advise, and it too collapsed and is now subject to litigation in Delaware.

7.      Despite the elevated risks, neither the Board nor Tortoise had effective mechanisms to ensure that the Funds could responsibly manage their levels of borrowing. Defendants failed to effectively test the Funds' portfolios under possible market conditions, implemented no meaningful standards or criteria for evaluating whether the leverage amounts were manageable, and made no plans for the (inevitable) event of a liquidity crisis.

8.      The excessive leverage not only exposed the Funds to a liquidity crisis, but also cost the Funds' stockholders over $150 million in leverage-related expenses between 2017 and 2020 (on top of as much as $80 million in additional management fees). In fact, the Funds' performance only worsened throughout the period as Tortoise added increasingly unreasonable leverage. In 2019, with more than a billion dollars of leveraged assets, the Funds underperformed more than 90% of their peers.

9.      In late February 2020, the liquidity risks created by Tortoise began to manifest. As market volatility increased and prices in the energy markets began to fall, the Funds' leverage ratio worsened, and Tortoise was forced to sell securities into a declining market in order to raise cash.

10. By the end of the first quarter of 2020, the Funds had lost over $1 billion—$572 million and $520 million, respectively—equating to between 60% and 70% of their net assets.

11. Stockholders fared even worse. Stockholders who previously held the Funds' shares at a small discount to the Funds' net asset values ("NAV") now hold shares trading at or near a 20% discount—*i.e.*, they can sell them at only 80 cents on the dollar, even after the depreciation caused by the Funds' crisis.

12. Few if any comparable funds unaffiliated with Tortoise incurred losses on the scale experienced by stockholders of the Funds. Moreover, because stockholders' losses have been "locked in" by Tortoise's securities sales, investors were deprived of the immediate energy market recovery in 2020 and the bull run of energy stocks and commodities thereafter. Thus, Defendants' conduct has stripped investors of not only a billion dollars of present value but hundreds of millions of dollars of lost returns.

13. The Board, in the aftermath of the Funds' collapse, has done precisely nothing to mitigate the losses. Instead, it has circled the wagons with Tortoise: (1) the Board has repeatedly rehired Tortoise for additional consecutive one-year contracts as investment adviser on exactly the same terms as pre-crisis with no consideration of alternatives and no consequences for Tortoise's reckless mismanagement; (2) it enacted new and illegal defensive bylaw provisions that limit the ability of investors to nominate and elect new directors, and thus influence the management of the Funds and potentially replace Tortoise and the Board; and (3) it rejected out of hand a proposal by a fund manager to purchase and advance the Funds' litigation claims arising from the crisis.

14. This action seeks rescission of Tortoise's investment advisory contract and damages caused by Defendants' reckless mismanagement of the Funds' portfolios and blatant advancement of their own self-interests over those of the Funds and their stockholders.

## II.     THE PARTIES

### A.     Plaintiffs

15.     Plaintiff Howard Nathanson is a resident of New York. Mr. Nathanson is a stockholder of NTG and has incurred losses as a result of the misconduct set forth herein.

16.     Plaintiff Gus Gordon is a resident of Texas. Mr. Gordon is stockholder of TYG and has incurred losses as a result of the misconduct set forth herein.

### B.     The Funds

17.     The Funds are non-diversified closed-end investment companies organized as Maryland corporations. They list their business address as 5100 W. 115th Place, Leawood, Kansas 66211, which is also Tortoise's principal place of business.

18.     A closed-end fund is a type of investment company registered under the Investment Company Act of 1940 (the "ICA") that issues a fixed number of shares to stockholders in a public offering, which are then traded in the market on a stock exchange. A closed-end fund is managed like a typical mutual fund, with the exceptions noted directly below.

19.     Unlike open-end mutual funds, which sell and redeem shares at their NAV, the shares of a closed-end fund trade on a stock exchange and, as a result, the market price of their shares may exceed a fund's NAV (*i.e.*, trade at a premium) or be lower than its NAV (*i.e.*, trade at a discount).

20.     As is typical of investment funds, the Funds have no employees or infrastructure of their own. They were formed by Tortoise and depend entirely on Tortoise and other service providers to provide the people and systems necessary to operate, subject to the oversight of the Board.

21.     During the relevant period, TYG invested primarily in equity securities of master limited partnerships ("MLPs") and their affiliates that transport, gather, process or store natural

gas, natural gas liquids, crude oil and refined petroleum products. NTG invested primarily in midstream energy equities that own and operate a network of pipeline- and energy-related infrastructure assets with an emphasis on those that transport, gather, process and store natural gas and natural gas liquids.

22.     Both Funds utilized significant "leverage" to increase the size of their investable assets. The term "leverage" refers to the difference in the value of a fund's total investment portfolio ("managed assets") and the value of capital contributed by investors ("net assets").

23.     As discussed in detail below, the Funds obtained leverage primarily by issuing senior notes, issuing preferred stock, and borrowing under a credit facility. The Funds used this leverage to purchase more MLP securities than they otherwise could have based on the amount of capital contributed by investors.

C.     **The Funds' Board of Directors**

24.     The Board consists of five members: (1) Conrad S. Ciccotello; (2) Rand C. Berney; (3) Jennifer Paquette; (4) Alexandra Herger; and (5) H. Kevin Birzer.

25.     Mr. Ciccotello has served as a director of TYG since 2003 and of NTG since 2010. He is a professor at the Reiman School of Finance, University of Denver.

26.     Mr. Berney has served as a director of TYG and NTG since 2014. He a professor at the College of Business Administration, Kansas State University.

27.     Ms. Paquette has served as a director of TYG and NTG since 2018. She is retired and formerly served Chief Investment Officer of the Public Employees' Retirement Association of Colorado.

28.     Ms. Herger has served as a director of TYG and NTG since 2015. She is retired and formerly served as interim vice president of exploration for Marathon Oil.

29.     Mr. Birzer has served as a director of TYG since 2003 and of NTG since 2010. He is the Chief Executive Officer of Tortoise, and thus has been designated as an "interested" director.

30.     Together, the individual defendants listed in ¶¶ 24-29 are referred to as to the "Director Defendants."

31.     The Director Defendants each owed fiduciary duties to stockholders, including the duties of care and candor.

32.     During the relevant period, the Director Defendants were responsible for overseeing the Funds' operations, establishing policies and procedures, and monitoring conflicts of interest between the Funds and their service providers, including Tortoise.

33.     As part of their responsibilities, the Director Defendants were required to identify the material risks associated with operating the Funds, assess the effectiveness of the Funds' risk controls, and continuously evaluate whether the Funds' policies, procedures and controls were working effectively to mitigate known risks.

**D.     Tortoise, The Funds' Investment Adviser**

34.     Tortoise is an SEC-registered investment advisory firm organized as a Delaware limited liability company. It offers MLP and energy infrastructure investment strategies for open and closed-end mutual funds, pension plans and individuals.

35.     As investment adviser, Tortoise owed stockholders fiduciary duties, including the duties of care and candor.

36.     Tortoise was responsible for the Funds' day-to-day operations, including management of the Funds' portfolio of securities pursuant to Investment Advisory Agreements ("Advisory Contracts").

37.     Under the Advisory Contracts, Tortoise agreed that it "shall be liable to the [Funds] for any loss, damage, claim, cost, charge, expense or liability resulting from the willful

misconduct, bad faith or gross negligence or disregard by the Advisor [*i.e.*, Tortoise Capital Advisors] of the Advisor's duties or standard of care, diligence and skill set forth in this Agreement."

38.     During the relevant period, Tortoise was compensated "in an amount equal to .95% [of the Funds'] total assets . . . including any assets attributable to any leverage that may be outstanding."

### III.     JURISDICTION

39.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 215 of the IAA, 15 U.S.C. § 80b–14, which provides that the "district courts of the United States . . . shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder" and "all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of this subchapter or the rules, regulations, or orders thereunder."

40.     This Court has personal jurisdiction over Tortoise and Defendant Birzer because their principal place of business is 6363 College Boulevard, Suite 100A, Overland Park, Kansas 66211.

41.     This Court has personal jurisdiction over Defendants Ciccotello, Berney, Pacquette and Herger because they are either residents of Kansas or subject to jurisdiction in Kansas pursuant to Kan. Stat. § 60-308 because they (1) transact business in this state with and through Tortoise in Overland Park, Kansas; (2) conspired to commit a tortious act in this state with and through Tortoise in Overland Park, Kansas; and/or (3) are directors of the Funds and have stated that their business address is in Overland Park, Kansas. In addition, jurisdiction in this matter is consistent with the constitutions of the United States and of this state.

8

42.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the misconduct at issue occurred within this judicial district and Tortoise is a resident of this judicial district.

43.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Tortoise's Use Of Leverage To Increase Assets Under Management

44.     Tortoise relied on a combination of credit facilities, senior notes and preferred shares to significantly increase the size of the Funds' investable assets.

45.     Increasing assets under management through leverage has the potential to increase investment returns, but also creates the risk not only of magnifying poor returns but also, if not properly managed, a liquidity crisis through which a fund may incur permanent losses. It also significantly increases the management fees that an investment adviser receives, thus creating a potential conflict between stockholders and the adviser.

46.     Each form of leverage that Tortoise employed (*e.g.*, senior notes, preferred stock, and credit facility borrowing) imposed certain asset-coverage requirements that required the Funds to maintain a specified level of net assets relative to amounts borrowed. If the asset-coverage requirements were violated, the Funds would be required to immediately reduce their outstanding leverage and pay back creditors.

47.     If the Funds lacked sufficient cash to reduce leverage in the amount required, then they would be forced to sell securities—possibly during a declining market—to generate sufficient cash to satisfy the asset-coverage requirements.

48.     Selling securities to satisfy asset-coverage requirements can cause the Funds to "lock in" their losses (*i.e.*, create permanent losses) even if the market rebounds thereafter. Thus,

responsible management of the Funds' use of leverage required Defendants to ensure that the Funds' leverage levels could be maintained in various market conditions without an unacceptable risk of permanent losses.

49.     During the relevant period, as the Funds' leverage increased, a liquidity crisis quickly became *the single largest investment-related risk to the Funds and their stockholders*. Defendants were responsible for managing the Funds' use of leverage carefully so as to prevent a liquidity crisis.

50.     As part of this responsibility, Defendants were required to identify, monitor and mitigate leverage-related risks, including by creating policies and procedures designed to ensure that the Funds had sufficient liquidity to meet their demands in a full range of market conditions.

51.     In connection with the above, the Director Defendants were also responsible for monitoring Tortoise's conflict of interest in using leverage.

52.     Because Tortoise collected its fees based on a percentage of the Funds' *total* managed assets—including leverage—it had a direct financial interest in maximizing the use of leverage to increase the Funds' total assets. Increases in leverage directly resulted in proportionate increases in Tortoise's fees.

53.     These risks and conflicts of interest associated with the use of leverage are well known to fund directors, and the Director Defendants were required to implement meaningful processes, procedures, and controls to ensure that decisions regarding the use of leverage were sound and not motivated by Tortoise's financial interest in extracting additional management fees.

**B.     The Board Permits Tortoise To Extract Additional
Management Fees Through Excessive And Useless Leverage**

54.     Although the Director Defendants were required to actively monitor the Funds' use of leverage and mitigate Tortoise's conflict of interest, they instead permitted Tortoise to extract

at least tens of millions of dollars in additional fees based on leverage that directly violated the Funds' publicly disclosed policies. This expensive additional leverage cost stockholders did nothing for stockholders other than significantly increase the risks to stockholders and enhance their losses.

55.     In public filings, Tortoise and the Director Defendants stated that it was their "policy . . . to utilize leverage in an amount that on average represents approximately 25% of our total assets," and that "[l]everage as a percent of total assets will vary depending on market conditions but will normally range between 20% and 30%."

56.     Tortoise and the Director Defendants also stated that they would "not use leverage unless we believe that leverage will serve the best interests of our stockholders" (*i.e.*, "whether the potential return is likely to exceed the cost of leverage").

57.     However, since at least 2017 the Funds' use of leverage has exceeded the publicly stated limitation of 30%.

58.     Until 2019, leverage accounted for approximately 31-34% of the Funds' total assets, in violation of the Funds' public policies. Throughout 2019, Tortoise permitted the Funds' leverage levels to spike even further. By the end of the year, TYG had increased its leverage to over 37% of total assets and NTG was utilizing a leverage ratio of nearly 40%.

59.     Investors learned of moderate increases in the Funds' use of leverage in August 2019 but would not learn of the Funds' end-of-year positions until February 2020 when the Funds filed their annual reports.

60.     Despite that the leverage exceeded the Funds' publicly disclosed limits, neither Tortoise nor the Director Defendants were effectively analyzing the associated liquidity risks or

whether the Funds' precarious positions continued to "serve the best interests of [their] stockholders," as the Board inaccurately told stockholders was part of their oversight.

61.     This is clear based on the conduct of comparable funds: although these funds were managed by advisers that also had financial interests in maximizing leverage, they either did not take on the level of risk with which Tortoise saddled the Funds or had controls to mitigate liquidity risks during a market downturn.

62.     Only one other fund unaffiliated with Tortoise utilized roughly the same amount of leverage used by NTG, and only two funds utilized more leverage than TYG. In other words, the Funds were *utilizing more leverage than virtually all of the dozens of comparable funds*.

63.     The excessive leverage not only significantly increased the Funds' risks of a liquidity crisis, but cost stockholders at least tens of millions of dollars in interest expenses and additional advisory fees with no offsetting returns.

64.     Between 2017 and 2020, the Funds and their stockholders paid *over $150 million in costs and expenses associated with leverage*, including interest expenses and distributions to preferred stockholders.

65.     Tortoise, for its part, collected *approximately $80 million* in additional advisory fees during the same period, which were solely attributable to its reckless decision to ratchet up the Funds' total leverage to over $1 billion in leverage-backed assets.

66.     These leverage-related expenses were dead weight and did nothing to improve performance, and the Funds consistently trailed their peers and their benchmarks. In 2019—as the Funds' use of leverage reached a crescendo—the Funds were *outperformed by more than 90% of their peer group*.

67.     Throughout the period, the Director Defendants did nothing to rein Tortoise in or hold it accountable for the Funds' poor performance and declining assets.

C.     **Defendants Turn A Blind Eye Even As Volatility Increases**

68.     In 2019, Tortoise acknowledged that energy markets were "experienc[ing] significant volatility" as a result of "escalating tensions in the Middle East culminating in significant, but temporary supply outages."

69.     Throughout the year, Tortoise's leverage decisions continued to fare poorly for investors, and TYG and NTG reported returns of -16.4% and -16.6%, respectively—more than double the -7% decline experienced by the Funds' benchmark during the same period.

70.     By the end of the 2019 fiscal year, the Director Defendants knew—unlike the Funds' stockholders, who had not yet learned—that the Funds had become leveraged well beyond their historical ranges, their peers, and the Funds' publicly disclosed policies.

71.     Nonetheless, the Director Defendants took no action and permitted Tortoise to maintain the Funds' precarious liquidity positions—approximately $1.08 billion in borrowings and other leverage—into early 2020.

72.     Indeed, the Director Defendants had no effective policies, procedures or other mechanisms in place for assessing the level of risk assumed by the Funds or testing for the Funds' ability to maintain assets through different market conditions.

73.     The Director Defendants also failed to establish parameters with respect to the timing or magnitude of increases in leverage and failed to establish any criteria for assessing the reasonableness of the Funds' leverage levels (such as relative to peers or historical norms) or when a deviation from the publicly stated maximum of 30% would be reasonable.

74.     The Director Defendants also failed to perform effective portfolio stress testing to determine whether and how the Funds would be able to manage their unreasonably inflated

leverage commitments during simulated market conditions, such as scenarios involving market-wide price declines caused by supply or demand shocks.

75.     Although the Director Defendants represented to investors in the Funds' annual reports that the Board was overseeing Tortoise's "responsible handling of the leverage target," in reality, the Director Defendants had failed entirely to mitigate the risks with which Tortoise had recklessly encumbered the Funds.

76.     To the extent the Board received any reporting on leverage risk, it ignored it and took no action, even as leverage risks exploded at the end of 2019 with heightened volatility.

77.     The Director Defendants failed not only to implement guidelines and benchmarks to *avoid* a liquidity crisis, but also to establish processes and procedures to help the Funds navigate such a crisis.

78.     For example, the Board failed to implement risk management mechanisms like a program for affiliated loans from Tortoise and/or the other funds it managed to create liquidity for the Funds during a crisis. Nor did the Board consider establishing alternative lines of credit or other less risky debt facilities.

79.     These risk-taking and risk-mitigation failures left the Funds unhedged and completely exposed to the next market downturn.

**D.     The Funds Lose $1 Billion In Early 2020**

80.     On February 5, 2020, the Funds disclosed to stockholders that the Funds were leveraged by nearly 40% of their net assets.

81.     Almost immediately thereafter, in February 2020, energy prices began to fall precipitously based on an ongoing dispute between OPEC and Russia as well as lockdowns caused by the COVID-19 virus. The price declines caused the Funds to fall out of compliance with their

asset coverage requirements, necessitating that they pay down their borrowings and redeem their notes and preferred shares.

82. In the absence of Board oversight or Board-imposed protocols for handling a liquidity crisis, Tortoise was left to proceed as it saw fit: by dumping the vast majority of the Funds' securities for enormous losses in order to pay down borrowings under the Funds' credit facilities and meet redemption requirements for the Funds' notes and preferred shares.

83. TYG ultimately reduced leverage by over $430 million, and NTG reduced by over $350 million. To make these reductions, the Funds sold enormous portions of their securities portfolios for permanent, recorded losses.

84. By the end of the first quarter, TYG reported losses of $572 million, and NTG reported losses of over $520 million—*i.e.*, over *a billion dollars in roughly two months*—reflecting 58% and 70% declines in net assets, respectively.

85. At the end of the year, TYG reported a decline in net assets of 61%, and NTG reported a decline of 74%, despite the fact that the *Funds' benchmark had declined by only 23% during the same period*.

86. Tortoise lamely attributed the losses to "required deleveraging during the weak market earlier in the year magnified negative performance." However, the vast majority of comparable funds did not incur losses anywhere near the magnitude of those incurred by the Funds.

87. Only two comparable unaffiliated funds incurred losses relative to assets on par with NTG and TYG. In dollars, NTG and TYG's combined losses dwarfed the entire combined net asset value of those funds.

88. Moreover, because the Funds' shares trade on a stock exchange and are not redeemed by the Funds at NAV, stockholders fared even worse than the Funds.

89.     Before 2020, the Funds' shares traded at a "discount" to NAV in the range of 3% to 6%. Following the Funds' liquidity crisis, the Funds' discounts ballooned to *well over 20%*.

90.     In other words, not only did the Funds' stockholders realize enormous investment losses, but in order to sell the Funds' shares, they were forced to accept *80 cents on the dollar or less*.

91.     The declines in the market capitalization of the Funds caused by Defendants and the significant increase in the trading discount imposed losses on stockholders in excess of the Funds' reported declines in NAV.

92.     Further, although the energy markets have since rebounded (and even rallied), the Funds' stockholders—with only a fraction of the Funds' assets remaining—have not shared in those returns.

93.     Indeed, even the longest holders in the Funds—investors *from the Funds' inceptions*—have incurred significant losses wiping out all prior gains.

94.     Thus, stockholders have lost substantial future investment returns in addition to the losses of their principal realized in early 2020.

95.     The scale of stockholders' losses under these circumstances is simply too large, anomalous, and unusual to be explained by merely unfavorable market conditions.

96.     Rather, a collapse to the extent of the Funds' was not experienced by the vast majority of comparable funds and was the direct result of Defendants' disregard of the Funds' liquidity position and foreseeable risks arising from the use of excessive leverage.

**E.     Defendants Take No Action To Protect Stockholders**

97.     Despite the gravity of the circumstances, the Director Defendants do not appear to have taken (or even considered) any action during or after the Funds' liquidity crisis to mitigate losses or otherwise hold Tortoise responsible.

98.     A diligent board could have implemented a range of actions during the crisis to mitigate losses, including a rights offering backed by Tortoise, requiring Tortoise to purchase newly issued shares from the Funds in a private transaction and at a premium to market in order to raise capital, or requiring Tortoise, its affiliates or their managed funds to extend unsecured loans to the Funds for the capital required.

99.     These options in combination or individually could have saved hundreds of millions of dollars in losses from the Funds' forced sales, but the Director Defendants did not even consider them. Rather, they appear to have allowed Tortoise free rein in dumping the Funds' securities to meet leverage requirements.

100.    In the wake of the Funds' enormous losses, which far exceeded those of their peers and benchmark, the Director Defendants still took no action to hold Tortoise responsible for its reckless management.

101.    To the contrary, in November 2020, the Director Defendants *renewed the Funds' Advisory Contracts with Tortoise* for another year on the same terms.

102.    In doing so, the Board purportedly considered the "quality" of Tortoise's services, including "the responsible handling of the leverage target," but did not address at all the Funds' liquidity crisis or the crippling losses the Funds incurred under Tortoise's reckless management.

103.    To the contrary, the Board purportedly determined (with no further explanation) that the Funds' performance—*i.e.*, the loss of more than a billion dollars—was "reasonable."

**F.     Tortoise And The Board Attempt To Protect
        <u>Themselves By Resorting To Illegal Entrenchment Measures</u>**

104.    Following the crisis, the Funds continued to trade at a consistently large discount to their NAVs. This meant that stockholders who had already incurred substantial investment losses would be required to accept even more losses in order to sell their shares and exit the Funds.

105.     In late 2020, while the Funds discounts were at or near 20%—certain closed-end fund activists with strategies of buying and "repairing" underperforming funds began to purchase shares of Tortoise's closed-end funds, including the Funds at issue.

106.     Rather than attempt to improve the Funds' performance and persistent discount, Tortoise and the Board set about enacting a series of defensive mechanisms designed to thwart stockholders' ability to nominate and elect new directors, preserve the Director Defendants' positions on the Board, and entrench Tortoise as the Funds' investment adviser.

107.     Among other measures, in October 2020 the Board amended the Funds' Amended and Restated Bylaws to add three defensive bylaws, all of which are illegal under the ICA: (1) a bylaw that limits the ability of stockholders to vote after their holdings exceed 10%, commonly called a "control share bylaw"; (2) a requirement that stockholders must hold their shares for three years before nominating a new directors; and (3) a requirement that stockholders must own at least 1% of the Funds to nominate a new director (together, the "Defensive Bylaws").

108.     Each of the Defensive Bylaws violates Section 18(i) of the ICA, which provides that "every share of stock hereafter issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock."

109.     On October 26, 2020, the Board announced the Defensive Bylaws to stockholders under the guise of pursuing the Funds' "investment objective and long-term value for stockholders."

110.     In reality, the Defensive Bylaws were enacted for a single purpose: to protect the Director Defendants' positions on the Board and Tortoise's role as investment adviser.

111.     Thereafter, in recognition of the size of the Funds' losses and the recklessness of Tortoise's mismanagement, a closed-end fund manager associated with Bulldog Investors, LLP

approached the Board to discuss the potential for purchasing the Funds' claims against Tortoise in exchange for a cash payment to the Funds and a portion of the ultimate recovery.

112.    Given that the Board has apparently decided not to consider making a recovery for the Funds of the substantial losses caused by Tortoise, the Director Defendants had no basis whatsoever not to engage in an arm's-length discussion with a counterparty interested in purchasing the Funds' claims.

113.    Indeed, from the Funds' perspective—the only perspective the Director Defendants are charged by law with advancing—such a transaction provides only upside (*i.e.*, the Funds would receive a cash payment with the possibility of additional cash payments at no risk to the Funds).

114.    Instead, the Board has not even responded to the fund manager's letter, either because the Director Defendants decided to reject the offer outright or the letter was never conveyed to them by Tortoise.

115.    As of the date of this filing, the Board has not acknowledged the correspondence regarding the Funds' claims.

## V.    DEMAND FUTILITY ALLEGATIONS

116.    Plaintiffs bring this action derivatively in the right and for the benefit of the Funds to redress the breaches of fiduciary duty and other violations of law by Tortoise and the Director Defendants, as alleged herein.

117.    Plaintiffs have owned shares of the Funds continuously at all relevant times set forth herein.

118.    Plaintiffs will adequately and fairly represent the interests of the Funds and their stockholders in enforcing and prosecuting the Funds' rights, and Plaintiffs have retained counsel experienced in prosecuting derivative actions of this nature.

119.    Plaintiffs have not made, and are excused from making, a pre-suit demand on the Board under Maryland law because "a majority of the directors are so personally and directly conflicted or committed to the [matter] in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky v. Collomb*, 362 Md. 581, 620 (2001); *see also Trasatti v. Trasatti*, 2018 WL 2750266, at *12 (Md. Ct. Spec. App. June 7, 2018).

120.    As an initial matter, one member of the five-person Board—Defendant Birzer—is an executive of defendant Tortoise and therefore is interested and conflicted. He does not claim to be an independent director of the Funds.

121.    As to the remaining four members, Defendants Ciccotello, Berney, Paquette and Herger are each "personally" and "directly" interested in this matter because each is a defendant in this action and was directly responsible for supervising Tortoise's misconduct that led to the Funds' collapse and the misstatements made to investors.

122.    Each Director Defendant failed to diligently and faithfully fulfill their duty to oversee Tortoise's management and the Funds' assumption of risk, causing the Funds to incur over a billion dollars in losses. In the aftermath, the Director Defendants have done nothing to remediate those losses, nor have they even considered whether Tortoise or the directors themselves were responsible for the losses or whether Tortoise should continue to be re-hired to manage the Funds. Instead, they have reflexively aligned themselves with Tortoise over the stockholders that they are duty-bound to protect.

123.    After the monumental destruction of wealth by Tortoise in 2020, followed by the persisting discount in the Funds' trading prices and languishing assets, followed by the Board's rejection of all avenues of recovery and the immediate assumption of defensive positions favoring

solely Tortoise and not the Funds, it is now apparent beyond all doubt that the Directors Defendants are incapable of independently managing the Funds' affairs.

124.    None of the Director Defendants are exculpated for their conduct under the Funds' governing documents, and thus they are both personally and financially interested in avoiding litigation over the Funds' losses and their personal liability as well as preserving their seats on the Board and the salary and esteem that comes with it.

125.    Such self-interest, however, cannot guide a fiduciary's actions. Through all of the misconduct described above, the Director Defendants have a dozen times over violated their duties to stockholders to advance *the Funds' interests* and not their own.

126.    As a result, the Director Defendants lack independence and capacity to fairly consider a pre-litigation demand and such a demand would thus be futile.

## CAUSES OF ACTION

## COUNT I

### Claim For Rescission Under Section 215 Of The IAA
### Against Tortoise

127.    Plaintiffs repeat and reallege all of the allegations set forth in the paragraphs above as if fully set forth herein.

128.    This count asserts a claim under Section 215 of the Investment Advisers Act of 1940 (the "IAA"), 15 U.S. Code § 80b–15, which provides that an investment advisory contract, "the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void."

129.     Plaintiffs, derivatively on behalf of the Funds, have a private right of action under Section 215 of the IAA pursuant to the U.S. Supreme Court's ruling in *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979).

130.     As set forth above, Tortoise's misrepresentations to stockholders regarding the use of leverage; excessive leveraging of the Funds' assets in an effort to, among other things, increase its own compensation; reckless management of the Funds leading to their collapse; hindrance of the Funds' and stockholders' efforts to make a recovery for those losses; and measures to entrench itself in its position by illegal means constitute, together and individually, "business which is fraudulent, deceptive, or manipulative" under Section 206 of the IAA and thus was prohibited.

131.     Pursuant to Section 215 of the IAA, the Advisory Contracts are voidable because of Tortoise's violations of Section 206 and the Funds are entitled to recessionary damages.

## COUNT II

### Claim For Breach Of Fiduciary Duty
### Against All Defendants

132.     Plaintiffs repeat and reallege all of the allegations set forth in the paragraphs above as if fully set forth herein.

133.     Pursuant to Maryland Code, Corps. and Assocs. § 2-405.1, Defendants owed a duty to stockholders to act in good faith; in a manner reasonably believed to be in the best interests of the corporation; and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

134.     First, Defendants breached their fiduciary duty by misrepresenting critical aspects of their management of the Funds' leverage and liquidity positions, which fell below the standard expected of a professional money manager.

135.     Among other things, Defendants falsely stated that the Funds' leverage typically would be limited to 30% of net assets when, in fact, the Funds exceeded that limitation for years and blatantly disregarded it throughout 2019, despite mounting risks.

136.     Defendants also falsely stated that leverage would be determined based on the "best interests of stockholders" when, in reality, the Director Defendants had no processes, procedures or other mechanisms to make that determination, and Tortoise was left free to exploit the Funds' use of leverage in a manner that maximized its own financial interests and created enormous risks for stockholders.

137.     Indeed, the Board had no effective processes or procedures whatsoever to determine whether the Funds' use of leverage was reasonable, the risks tolerable, or whether Tortoise had permitted its own self-interest to guide the leverage decisions.

138.     Second, Defendants breached their duties by intentionally causing the Funds to acquire leverage in an amount greater than their own stated leverage limitations and greater than virtually all comparable and unaffiliated funds without effective means to ensure that the amounts were reasonable or that the Funds could maintain their positions.

139.     This was a self-interested decision that resulted in millions of dollars in additional compensation to Defendants but created tremendous risks to stockholders.

140.     Defendants knew or should have known of the tremendous risks created by their conduct, including that the Funds would not be able to support their leverage if the markets declined even modestly, but callously ignored these risks until the Funds collapsed in 2020, resulting in over a billion dollars in losses to stockholders.

141.     Defendants intentionally failed to perform their duties to reasonably manage the Funds' use of leverage in reckless disregard of the consequences to stockholders and in a manner

suggesting a thoughtless disregard of the consequences without the exertion of any effort to avoid them.

142.    <u>Third</u>, Defendants breached their duties by refusing to consider mitigating the Funds' catastrophic losses and, instead, rehiring Tortoise year after year on the same terms and taking defensive measures designed only to advance the interests of Defendants at the expense of stockholders. Defendants refused to consider the availability of recovery against culpable parties and even rejected an overture by a respected closed-end fund manager to purchase and pursue claims on the Funds' behalf. Further, Defendants adopted the illegal Defensive Bylaws, which violate the ICA, rather than attempting to improve the Funds' performance and persistent discount. The defensive measures above were solely calculated to limit the liability of Defendants, preserve the Director Defendants' seats on the Board, and maintain Tortoise's position as investment adviser—all at the direct and substantial expense of the Funds and their stockholders.

143.    The misconduct described above has caused stockholders to incur hundreds of millions of dollars in realized and unrealized losses, has deprived stockholders of essential rights, including franchise rights, and will continue to harm stockholders in the future.

144.    The Funds' charters expressly provide that Defendants are liable to stockholders for their own misconduct, including their gross negligence, recklessness and bad faith. Defendants are not exculpated in any way for the misconduct described above.

145.    Defendants are liable to the Class for damages in an amount to be proven at trial.

<strong><u>PRAYER FOR RELIEF</u></strong>

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Declaring that this suit is properly brought as a derivative action and that pre-suit demand is futile;

24

B.      Declaring that Tortoise breached Section 206 of the IAA in the performance of the Advisory Contracts and that the Funds are entitled to rescission pursuant to Section 215 of the IAA;

C.      Declaring that Defendants breached their duties owed to the Funds and are liable for damages in an amount to be proven at trial, including pre-and post-judgment interest;

D.      Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

E.      Granting such further relief as the Court deems just and proper.

Dated: August 18, 2022

**SCHLICHTER BOGARD & DENTON, LLP**

 /s/ Kristine K. Kraft
Kristine K. Kraft, No. 14889
Andrew D. Schlichter, Mo. Bar. No. 58959*
Sean E. Soyars, Mo. Bar No. 57317*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Tel. : 314-621-6115
Fax : 314-621-5934
kkraft@uselaws.com
aschlichter@uselaws.com
ssoyars@uselaws.com
*pro hac vice forthcoming*

**MORRIS KANDINOV LLP**
Aaron T. Morris, NY Bar No. 5675178*
Andrew W. Robertson, NY Bar No. 4288882*
1740 Broadway, 15th Floor
New York, NY 10019
Tel.: 877-216-1552
aaron@moka.law
andrew@moka.law

Leonid Kandinov, CA Bar No. 279650*
550 West B Street, 4th Floor
San Diego, CA 92101
Tel.: 619-780-3993
leo@moka.law
*pro hac vice forthcoming*

*Counsel for Plaintiffs*

DocuSign Envelope ID: F3BAEE70-716D-40CA-9E93-508F44E5EE56

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| HOWARD NATHANSON and GUS GORDON, derivatively on behalf of TORTOISE ENERGY INFRASTRUCTURE CORP. and MIDSTREAM ENERGY FUND, <br><br>          Plaintiffs, <br><br>    v. <br><br> TORTOISE CAPITAL ADVISORS, L.L.C., CONRAD S. CICCOTELLO, RAND C. BERNEY, H. KEVIN BIRZER, JENNIFER PAQUETTE, and ALEXANDRA HERGER, <br><br>          Defendants, <br><br> -and- <br><br> TORTOISE ENERGY INFRASTRUCTURE CORP. and MIDSTREAM ENERGY FUND, <br><br>          Nominal Defendants. | |

## AFFIDAVIT AND VERIFICATION OF HOWARD NATHANSON

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ): SS. |
| COUNTY OF NASSAU | ) |

HOWARD NATHANSON, being duly sworn, does hereby state as follows:

      1.    I, Howard Nathanson, am a plaintiff in the above-captioned action and a continuous holder of common stock of Tortoise Midstream Energy Fund, Inc. ("NTG") during all relevant times alleged in the Verified Shareholder Derivative Complaint for Declaratory, Injunctive, and Monetary Relief (the "Complaint").

DocuSign Envelope ID: F3BAEE70-716D-40CA-9E93-508F44E5EE56

2.      I am a resident of New York and am of full legal age. I am authorized to make this affidavit in support of the Complaint filed in the above-captioned case.

3.      I make this affidavit under penalty of perjury under the laws of New York.

4.      I have read the Complaint and consulted with counsel. The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

Howard Nathanson
8/17/22, 12:13 PM

DocuSign Envelope ID: B9F60E36-C1CD-472C-89DD-6874971DFC0F

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

HOWARD NATHANSON and GUS
GORDON, derivatively on behalf of
TORTOISE ENERGY INFRASTRUCTURE
CORP. and MIDSTREAM ENERGY FUND,

                Plaintiffs,

     v.

TORTOISE CAPITAL ADVISORS, L.L.C.,
CONRAD S. CICCOTELLO, RAND C.
BERNEY, H. KEVIN BIRZER, JENNIFER
PAQUETTE, and ALEXANDRA HERGER,

                Defendants,

-and-

TORTOISE ENERGY INFRASTRUCTURE
CORP. and MIDSTREAM ENERGY FUND,

                Nominal Defendants.

## AFFIDAVIT AND VERIFICATION OF GUS GORDON

STATE OF TEXAS               )
                               ): SS.
COUNTY OF SMITH          )

GUS GORDON, being duly sworn, does hereby state as follows:

      1.      I, Gus Gordon, am a plaintiff in the above-captioned action and a continuous holder

of common stock of Tortoise Energy Infrastructure Corp. ("TYG") during all relevant times

alleged in the Verified Shareholder Derivative Complaint for Declaratory, Injunctive, and

Monetary Relief (the "Complaint").

DocuSign Envelope ID: B9F60E36-C1CD-472C-89DD-6874971DFC0F

2.      I am a resident of Texas and am of full legal age. I am authorized to make this affidavit in support of the Complaint filed in the above-captioned case.

3.      I make this affidavit under penalty of perjury under the laws of Texas.

4.      I have read the Complaint and consulted with counsel. The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

DocuSigned by:

*Gus Gordon*

8AB09AE40B5A4E9...

Gus Gordon

8/17/2022

2